IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FIRST FITNESS INTERNATIONAL, INC., | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 3:07-CV-1171-N |
| FREDERICK THOMAS, *et al.*, | § § § | |
| Defendants. | § | |

## **ORDER**

This Order addresses Plaintiff First Fitness International, Inc.'s ("FFI") motion for a preliminary injunction [16] and motion for summary judgment [20]. For the reasons given below, the Court denies both motions.

### I. FACTUAL BACKGROUND

FFI is the owner of various federal trademarks, including FIRST FITNESS, ZAVITA, BODY FX, and SUDDENLY SLIM!, which it uses to market and distribute nutritional and dietary foods and supplements through a network of authorized distributors and its websites, www.firstfitness.com and www.zavita.com. FFI objects to Defendants' use of the domain name www.1stfitness.net to purchase FFI products from authorized distributors, and their use of www.getskinnytoday.info and www.slimfx.us to direct potential customers to Defendants' "eBay store," where Defendants resell FFI products under the assumed trade name "ZavitaRitaville" without FFI's authorization. Defendants purchase FFI products from the excess inventories of authorized distributors and resell those products at a substantial

discount without repackaging or otherwise altering them in any manner. Defendants' eBay comments include one post by a purported repeat customer who claims to have once received an expired product from Defendants. After being notified of FFI's trademarks rights and legal contentions, Defendants disabled the www.1stfitness.net URL and placed disclaimers on the remaining sites, indicating that their operations are not affiliated with FFI.

FFI alleges causes of action against Defendants for infringement of FFI's federal trademark rights, violation of the Anticybersquatting Consumer Protection Act ("ACPA") 15 U.S.C. § 1125(c), unfair competition, and Texas' anti-dilution statute, TEX. BUS. & COM. CODE § 16.29. FFI now moves to enjoin Defendants from operating their resale business and for summary judgment on each of their claims.

## II. APPLICABLE LEGAL STANDARDS

The decision to grant or deny a preliminary injunction lies within the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris County v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999). To obtain a preliminary injunction, the movant must establish the following: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable harm if the preliminary injunction is denied; (3) that the potential injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the preliminary injunction will not

disserve the public interest. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, courts need not sift through the record in search of triable issues. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In doing so, the nonmovant may not rely on "naked assertions of an actual dispute" but instead "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *In re Lewisville Props., Inc.*, 849 F.2d 946, 950 (5th Cir. 1988) (citing *Anderson*, 477 U.S. at 255-56). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1429

(5th Cir. 1996) (en banc).  If the nonmoving party fails to make a showing sufficient to establish an element essential to its case, the Court must grant summary judgment. *Celotex*, 477 U.S. at 322-23.

### III.  FFI Is Entitled to Neither a Preliminary Injunction nor Summary Judgment Because FFI Has Failed to Show that Defendants Sell Non-Genuine FFI Products

FFI has shown neither a substantial likelihood of success on the merits of its claims nor that it is entitled to judgment as a matter of law because, given the record before the Court, it appears that Defendants lawfully resell genuine FFI products.

#### A.  *The First Sale Doctrine Protects Those Who Merely Resell Genuine Products from All Trademark-Related Liability*

As a general rule, "trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent." *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590 (5th Cir. 1993) (quoting *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991)).  In other words, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product.  Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995).

This rule, typically referred to as the "exhaustion" or "first sale" doctrine, merely acknowledges that "liability under the Lanham Act is predicated on the use of a trademark in a way that is likely to cause confusion." *Matrix Essentials*, 988 F.2d at 590 (internal quotation marks omitted).  Therefore, a reseller of genuine trademarked goods faces no

ORDER – PAGE 4

trademark-related liability because a consumer buying genuine goods through a secondary seller "gets exactly what the consumer bargains for, the genuine product of the particular producer." *Sebastian*, 53 F.3d at 1075.

When applicable, the first sale doctrine precludes more than just federal trademark liability under the Lanham Act. It also serves as a defense to cybersquatting claims brought under the ACPA, *see* 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 25:78 (4th ed. 2008) ("[A]ny defense available under the Lanham Act is also available to a defendant to a charge of cybersquatting"); *see also Kitty Walk Sys., Inc. v. Midnight Pass, Inc.*, 431 F. Supp. 2d 306, 310 (E.D.N.Y. 2006) (dismissing ACPA claim because "Defendants are merely advertising authentic goods, over the internet, of which they are in proper possession"), and forecloses liability under a number of federal and state causes of action, including unfair competition, *see John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 736-37 (Tex.App. - Austin 2000) ("The Fifth Circuit concluded that [the first sale] doctrine precludes liability for . . . unfair competition under federal law . . . . We hold that the same is true under common law actions in Texas."), and Texas' anti-dilution statute, *id.* ("As a matter of law there can be no blurring or tarnishment under [TEXAS BUSINESS & COMMERCIAL CODE] section 16.29 where a retailer has resold the mark owner's genuine products.").

It is important to note, however, that the first sale doctrine only exhausts a trademark owner's right to restrict the resale of "genuine" goods. For example, the doctrine generally does not protect the resale of goods that have been repackaged, reconstructed, or modified

in some other material way. *See* 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 25:41 (4th ed. 2008) ("[T]he unauthorized repackaging or reconstruction or other modification of the goods by a distributor are exceptions to the first sale doctrine."). In addition, the doctrine does not protect the sale of trademarked goods that, since leaving the trademark holder's control, have not been maintained according to the trademark holder's legitimate, nonpretextual quality control standards. *See Warner-Lambert Co. v. Northside Development Corp.*, 86 F.3d 3, 6 (2d Cir. 1996) (holding that a product that does not conform to the trademark holder's quality control standards is not a "genuine" product, so long as (i) those quality control standards are "legitimate, substantial, and nonpretextual," (ii) the trademark holder abides by them itself, and (iii) nonconforming sales "will diminish the value of the mark"). The doctrine also excludes resellers who falsely hold themselves out as dealers authorized by the trademark holder. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006) ("[T]he first sale doctrine does not protect resellers who use the other entities' trademarks to give the impression that they are favored or authorized dealers for a product when in fact they are not."). *But see Sebastian*, 53 F.3d at 1076 ("The 'first sale' rule is not rendered inapplicable merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer.").

Here, FFI asks the Court to enjoin Defendants resale operations and enter summary judgment on its behalf, but fails to show that Defendants are doing anything other than selling genuine FFI products. FFI does not argue that Defendants repackage or otherwise modify the FFI products they resell. Instead, FFI argues that Defendants sell non-"genuine"

FFI products because Defendants (1) may have sold an expired product on at least one occasion, (2) do not offer the same product refund/return policy that FFI requires authorized distributors to follow, and (3) use FFI's trademarks in a manner that suggests that they are authorized FFI dealers.  None of these arguments is substantially likely to succeed on its merits[1] and, given the present record, each requires the determination of at least one genuine issue of material fact.

### B.  FFI Has Not Shown that Defendants Violated Any Legitimate Quality Control Standards that Pertain to the Products at Issue

FFI first argues that Defendants fail to satisfy FFI's quality control standards because Defendants may have sold expired products.  Courts have recognized that what may have otherwise started out as genuine products may cease to be so if they "could potentially contain a latent product defect due to the unauthorized distributor's failure to observe the manufacturer and mark owner's rigorous quality control standards."  *Matrix Essentials*, 988 F.2d at 591.  Under this rule, for example, a secondary distributor cannot sell what is otherwise genuine Shell gasoline under Shell's trademark without observing Shell's tank and line cleaning standards because, without those requirements, resold gasoline might contain impurities not found in "genuine" Shell gasoline.  *See id.* at 590 (describing the holding in *Shell Oil*, 928 F.2d at 107).  Similarly, a secondary beer distributor cannot sell beer manufactured and labeled by Coors under Coors' trademark without maintaining Coors' refrigeration requirements during transportation and storage because, without those

---

[1]At least when viewed prospectively for purposes of FFI's motion for preliminary injunction.

requirements, the beer could deteriorate. *See id.* at 590 (describing the holding in *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 134-137 (D. Colo. 1980).

Here, however, FFI can point to no pertinent quality control requirement that Defendants failed to follow, and FFI offers extraordinarily scant evidence that Defendants ever sold expired products. FFI's argument rests wholly on a single comment from an eBay customer stating that "I'm a repeat customer, but this time I got an expired product . . . ." Defendants respond that they communicated via email with this individual at the time the comment was made and resolved the customer's concern by pointing out that what the customer believed to be an expiration date was actually the product's date of manufacture. Accordingly, to the extent that this anonymous comment even qualifies as proper summary judgment evidence, there is at least a genuine issue of material fact as to whether Defendants have even sold a single expired product. Moreover, even if Defendants had sold expired products at times in the past, it is not clear that this fact alone would defeat the first sale doctrine in this case. Although courts have recognized that intentionally selling large quantities of goods beyond their expiration dates is not protected by the first sale doctrine, *see Warner-Lambert*, 86 F.3d at 6-8 (holding that first sale doctrine did not apply to secondary distributor that knowingly resold large quantities of expired cough drops), FFI has failed to introduce any undisputed evidence regarding what specific procedures, if any, it requires its authorized dealers to take to ensure that expired products do not enter the market[2]

---

[2]FFI does state in an affidavit that its quality control procedures include (i) placing expiration dates and lot numbers on products and (ii) prohibiting distributors from stockpiling excess inventory. However, FFI nowhere contends that Defendants have ever

ORDER – PAGE 8

and, even if it had, the Court is skeptical that evidence of one sale of expired goods is particularly probative of whether Defendants have lived up to such standards, if they exist.

FFI further argues that Defendants sell non-genuine products because they do not offer the same product return/refund policy that FFI requires its authorized distributors to follow. However, the Fifth Circuit has made clear that, to defeat the first sale doctrine, deviations from a mark owner's quality control requirements must pertain to "*the product itself*." *Matrix Essentials*, 988 F.2d at 591 (emphasis in original). Accordingly, secondary distributors need follow only those requirements that directly impact the quality of the actual product. Unauthorized distributors need not, for example, install the product as required by the manufacturer, *see id.* at 591 (describing the holding in *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005 (2d Cir. 1989)), or ensure that customers receive a manufacturer-required consultation with a cosmetologist or tanning salon employee prior to purchase, *see Matrix Essentials*, 988 F.2d at 591-92; *S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 203-05 (E.D.N.Y. 2007) (holding that reselling tanning products without manufacturer-required consultation with tanning salon employee did not render the products non-genuine). In the Court's estimation, adherence to a mark owner's refund policy

---

removed or tampered with products' expiration dates or lot numbers. Further, although FFI argues that it prohibits stockpiling, Defendants contend that stockpiling is commonplace among FFI distributors and even strongly encouraged by FFI's procedures for compensating/rewarding its distributors. Indeed, FFI does not dispute that Defendants have built a thriving business fueled by authorized distributors' accumulated excess inventory. Accordingly, even if FFI's professed desire to discourage stockpiling is aimed at keeping expired products off the market (and not at combating perverse incentives created by its multi-level marketing framework), Defendants have raised a genuine issue of material fact whether FFI enforces this requirement.

ORDER – PAGE 9

is more like the installation and consultation requirements rejected in *Siemens* and *Matrix Essentials* than the purity and refrigeration standards required of resellers in *Shell Oil* and *Adolph Coors*. Accordingly, the Court holds that this sort of "quality" control requirement is not sufficiently tethered to the quality of the "product itself" to preclude application of the first sale doctrine.

### C. FFI Has Not Shown that Defendants Held Themselves Out as FFI or One of Its Authorized Distributors

Finally, the Court addresses whether Defendants held themselves out as authorized FFI dealers and, therefore, fall within an exception to the first sale doctrine.[3] Several courts have held that resellers are not protected by the first sale doctrine if they hold themselves out as authorized dealers of the mark owner. *See Australian Gold*, 436 F.3d at 1241. However, those reselling genuine goods are entitled to use the mark owner's trademark in doing so – even in cyberspace. *See* 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 25:41 (4th ed. 2008) ("The [first sale doctrine] extends to a retailer's use of a mark in cyberspace. A retailer can use a brand name on web site ads selling that branded product without a license from the trademark owner."). Therefore, FFI must point to more conduct on the part of Defendants than simply using FFI's mark to identify the brand of products they had for sale. *See Sebastian*, 53 F.3d at 1076 (holding that, to fall outside the

---

[3]FFI does not directly argue in its briefing that Defendants are precluded from relying on the first sale doctrine because they held themselves out as FFI or its authorized distributor. However, FFI does raise the issue once in passing in its motion for preliminary injunction and makes the objections to Defendants' websites that the Court discusses below. Accordingly, the Court gives FFI the benefit of the doubt that it raised this argument and addresses whether Defendants held themselves out as affiliated with FFI.

first sale doctrine, a reseller must do "more than stock, display, and resell a producer's product under the producer's trademark"). Looking prospectively for purposes of FFI's motion for a preliminary injunction, the Court holds that FFI has not shown a substantial likelihood of success on the merits of this argument because, after receiving notice of FFI's claims, Defendants voluntarily added prominent disclaimers to their websites, stating that they are not affiliated with FFI, and disabled their www.1stfitness.net website altogether pending the outcome of this case.

Looking retroactively for purposes of FFI's motion for summary judgment, the Court concludes that the record raises serious concerns about whether Defendants held themselves out as FFI or as one of its authorized distributors, but does not entitle FFI to judgment as a matter of law. The strongest evidence that Defendants held themselves out as FFI affiliates is the fact that Defendants registered the domain name www.1stfitness.net and seemingly assumed the name "1st Fitness - Wholesale Nutrition" for the purposes of operating that website. Defendants' 1stfitness.net site also listed what appears to be a false address for "1st Fitness" in Dallas, Texas, which is suspiciously located in the same metropolitan area as FFI's headquarters.[4] On the other hand, several considerations also indicate that Defendants

---

[4]Defendant Sapp does raise an issue of fact as to the origin of this misleading address. In response to one of FFI's interrogatories, she states that this address belongs to a friend in Tallahassee, Florida, and the individual who created the website mistakenly replaced Tallahassee with Dallas, Texas. It is not for the Court to determine at this stage whether this explanation is credible. *Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007) ("[C]ourts are requried to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" (quoting *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962))).

ORDER – PAGE 11

did not intend to hold themselves out as affiliated with FFI – or at least were woefully ineffective at doing so.[5]  For example, 1stfitness.net was a "free Starter Web Page" and was prominently marked as such.[6]  The site was also constructed in a quite unsophisticated manner, with only a few lines of text (with typos) and a few links – including one to a hotmail.com email account.  The Court is therefore skeptical that any visitor to this site would have reasonably connected it with FFI, "a premier seller of . . . nutritional and dietary food supplements throughout the United States."  Pl.'s Br. in Supp. of its Mot. for Summ. J. at 1.  Defendants were also careful on the site to distinguish between "1st Fitness" and "FirstFitness [sic]."  That is, despite their use of the "1st Fitness" name, Defendants stated on the site that they were interested in obtaining "FirstFitness products."  More importantly,

---

[5]Case law on this exception to the first sale doctrine does not indicate whether the "holding out" inquiry is predominantly subjective or objective.  The Court holds that evidence of both the accused infringer's subjective intent as well as the objective effect of the infringer's trademark use on reasonable customers is relevant in determining whether the accused infringer held himself out as affiliated with the mark owner.  *See Sebastian*, 53 F.3d at 1075 (holding that objective evidence in the form of a customer survey indicating that "stocking and reselling . . . confused consumers into believing . . . that there is some type of affiliation" is, without more, insufficient to rebut the first sale doctrine (internal quotation marks omitted)); *cf. John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977 (11th Cir. 1983) ("Although objective factors are most important in assessing the likelihood of confusion between two marks, . . . courts also examine the defendant's subjective intent." (internal citation omitted)).

[6]There are multiple screen captures of Defendants' websites in the record.  For the purposes of this analysis, the Court refers to the websites as they appear at the earliest dates included in the record.  *See* Pl.'s Compl. Ex. G (displaying Defendants' 1stfitness.net site as it appeared on April 19, 2007); Ex. I (displaying getskinnytoday.info as it appeared on June 26, 2007); Ex. P (displaying slimfx.us as it appeared on June 26, 2007).  The record does not appear to include screencaptures of getskinnytoday.info or slimfx.us dated prior to June 26, 2007.

however, Defendants' did not *sell* FFI products through 1stfitness.net; instead, they only used the site to advertise the fact that they wanted to *buy* FFI products.[7] The site was solely directed at authorized FFI distributors who might want to sell their excess inventory. Accordingly, even if customers interested in purchasing FFI products stumbled upon 1stfitness.net, it is hard to imagine that they would believe that FFI or one of its authorized distributors operated the site because, presumably, no FFI-related entity would need to purchase FFI products on the secondary market.

Defendants also operate two other sites – www.getskinnytoday.info and www.slimfx.us – but they offer even fewer indications of affiliation. FFI argues that the domain name slimfx.us is similar enough to its trademarks BODY FX, and SUDDENLY SLIM! to cause confusion as to Defendants' affiliation. However, the Court disagrees. The domain name is, at worst, a combination of otherwise generic components of FFI's marks.[8] The most troubling aspect of these sites is Defendants' use of the name "ZavitaRitaville" in connection with these sites and their eBay store.[9] However, as with 1stfitness.net above,

---

[7]The site did contain a link to Defendants' www.getskinnytoday.info site, where customers can purchase FFI products. However, the site did not suggest in any way that products could be purchased at getskinnytoday.info. The site merely listed getskinnytoday.info as the website where visitors could "[v]isit us."

[8]In fact, SLIM FX and SLIM FX SPA were once registered U.S. trademarks owned by Worldwide Health Resources, Inc. for use in connection with nutritional supplements. Worldwide Health abandoned the marks in 2005 and 2003, respectively.

[9]Defendant Sapp again raises an issue of fact as to the origin of this allegedly misleading name. In response to one of FFI's interrogatories, she states that "ZavitaRitaville" does not refer to FFI's trademark ZAVITA, but to two horses she owns named "ZaVita" and "Rita" and to the fact that she often refers to her stables as "Margaritaville," in homage to the Jimmy Buffet song. Defendants also assert that they have

apart from a highly questionable choice of assumed trade name, these websites otherwise appear unlikely to confuse customers into believing Defendants are affiliated with FFI.[10] The sites simply advertise that Defendants resell genuine FFI products and acknowledge, at least indirectly, that Defendants' operations are separate and distinct from FFI. In fact, these websites again advertise that Defendants wish to purchase FFI products from authorized distributors and encourage customers to compare Defendants prices to those advertised by FFI at www.firstfitness.com.

Accordingly, although the Court notes that the record reveals serious concerns about Defendants' Internet activities prior to disabling 1stfitness.net and placing disclaimers on their other websites, the Court concludes that genuine issues of material fact obscure whether Defendants held themselves out as authorized distributors at some time in the past and, therefore, preclude judgment as a matter of law at this time. *Cf. Farouk Sys., Inc. v. Target Corp.*, No. 06-20883, 2008 WL 181130, at *1 (5th Cir. Jan. 22, 2008) (noting that, although a court may grant summary judgment on the issue, "likelihood of confusion is a question of fact"); *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, __ F.3d __, No. 07-4095, 2008 WL 2204387, at *6 (10th Cir. May 29, 2008) (noting that, because likelihood of confusion is a question of fact, summary judgment is only appropriate to "monitor the

---

never sold, nor offered for sale, Zavita-branded products.

[10]As noted above in note 6, no summary judgment evidence exists in the record indicating how these two sites appeared prior to June 26, 2007 – that is, before Defendants first modified their sites in May 2007 after learning of FFI's trademark rights and legal contentions.

outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion").

Therefore, FFI has failed to establish that Defendants' resale business is not protected by the first sale doctrine, which if applicable precludes all four of FFI's claims. The Court, therefore, holds that FFI has failed to meet its burden for obtaining a preliminary injunction or summary judgment in its favor.

## CONCLUSION

Accordingly, because FFI has shown neither a substantial likelihood of success on the merits of its claims nor the absence of genuine issues of material fact as to any of its claims, the Court denies FFI's motion for preliminary injunction and motion for summary judgment.

Signed June 13, 2008.

_____
David C. Godbey
United States District Judge